IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUBBELL INDUSTRIAL CONTROLS, INC., & HUBBELL INCORPORATED, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) Case No. 12-8609 |
| ELECTRO POWER SYSTEMS OF UTAH, INC. | ) ) ) ) |
| Defendant. | ) |

## COMPLAINT

Plaintiffs HUBBELL INDUSTRIAL CONTROLS, INC. and its parent, HUBBELL INCORPORATED ("collectively Hubbell"), by and through their undersigned attorneys and for their Complaint against Defendant ELECTRO POWER SYSTEMS OF UTAH, INC. ("EPSU"), state as follows:

## NATURE OF THE ACTION

1.  For more than 45 years, Hubbell has been in the business of designing, manufacturing and selling industrial controls, including contactors and their component parts. EPSU is in the business of selling and rebuilding certain industrial control products and devices, including contactors and their component parts. This action arises from EPSU's unlawful attempt to reproduce certain component parts for Hubbell's contactors, then pass off the contactors as being manufactured by or emanating from Hubbell when they were not. EPSU's unlawful reproductions even include Hubbell part numbers imprinted with the same method, font and type size that Hubbell uses to imprint part numbers on authentic products. Hubbell seeks to permanently enjoin the defendants from the continued reproduction, sale and distribution of

counterfeit braking contactors. Hubbell also seeks to recover profits derived by the defendants from their sale of counterfeit Hubbell braking contactors, along with compensatory statutory and treble damages, punitive damages, prejudgment interest and attorneys' fees and costs.

## PARTIES

### *Plaintiffs*

2. Hubbell Industrial Controls, Inc. is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in Archdale, North Carolina. Hubbell is a leading designer, manufacturer and supplier of industrial control products, including braking contactors. Hubbell Incorporated is the parent company of Hubbell Industrial Controls, Inc.

### *Defendant*

3. EPSU is a corporation organized and existing under the laws of the State of Utah and having its principal place of business in Lindon, Utah. EPSU is in the business of selling and rebuilding certain industrial control products and devices, and their component parts, that are used on overhead cranes and in other industrial applications.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 in that there are causes of action arising under 15 U.S.C. §§ 1114(1) and 1125(a)(1) (Lanham Act).

5. This Court has personal jurisdiction over EPSU because EPSU transacts business in this State.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because EPSU is a corporation deemed to reside in any judicial district in which it is subject to personal jurisdiction.

**BACKGROUND**

*Hubbell's Business*

7. Hubbell is in the business of manufacturing and supplying a wide variety of industrial control products and devices. Hubbell offers, under its own brand name, a full line of industrial, radio and fire pump controls, DC drives, pressure and master switches. Hubbell has been continuously engaged in the business of designing, manufacturing, distributing and/or selling industrial products for more than 45 years.

8. Hubbell's brand name is universally recognized throughout the United States as an identifier of quality Hubbell products and is registered with the U.S. Patent and Trademark Office ("USPTO") (since 1996) under Registration Number 1,982,131. (Attached as Exhibit A is a status report obtained from the USPTO website reflecting Hubbell's ownership of the trademark).

9. Hubbell's trademark – a ridged oval circumscribing the bolded name "Hubbell" – is also universally recognized throughout the United States as an identifier of quality Hubbell products and is registered with the USPTO (since 1975) under Registration Number 1,019,302. (Attached as Exhibit B is a status report obtained from the USPTO website reflecting Hubbell's ownership of the trademark). The HUBBELL® trademarks referenced herein are among several federally registered marks owned by Hubbell as part of its family of HUBBELL® marks.

10. Among Hubbell's industrial control products is its Type 5210 contactor (the "5210 contactor"). A picture of Hubbell's 5210 contactor is attached hereto as Exhibit C. Hubbell's 5210 contactor bears the HUBBELL® trademark as well as a label that contains nomenclature identifying the contactor with Hubbell. Hubbell's 5210 contactor has many industrial uses, including in the braking systems of overhead cranes.

11. Hubbell's 5210 contactor contains more than one hundred (100) electrical components and parts. One of the component parts in the 5210 contactor is a "blowout coil." The "blowout coil" is a piece of copper wound into a coil shape, and then welded to a copper "stationary support." Another component part is the operating coil.

12. Hubbell's 5210 contactor comes in various sizes and features many unique design and engineering advancements that simplify applications, installations and servicing. More than 75 years of experience in design as well as manufacturing have been incorporated into these units. Hubbell prides itself on the reliability of these units.

### *EPSU's Unauthorized Reproduction of Hubbell Contactor Parts*

13. EPSU does not manufacture or sell its own brand name contactors. Instead, EPSU sells and/or reproduces "after-market" parts that can fit into the various brand-name contactors made by others. EPSU will also sell and/or reproduce an entire "after-market" contactor that can fit into the same places as a given name-brand contactor.

14. Since the mid-1990s, EPSU has attempted to "reverse engineer" certain parts for contactors, and then attempted to reproduce the manufacturing of those parts themselves, including blow-out coils and operating coils. Since 1995, EPSU has reproduced at least one hundred (100) blow-out coils for Hubbell's 5210 contactors. During the entire time EPSU has been reproducing Hubbell blowout coils and operating coils, the same blowout coils have been available from Hubbell. Hubbell was not aware of EPSU's attempts to reproduce Hubbell blowout coils and operating coils.

15. EPSU's reproduction process is based on the visual inspection of Hubbell components by EPSU personnel. EPSU has not employed anyone who had an electrical

engineering degree or a mechanical engineering degree to provide guidance for the reproduction process.

16. When EPSU attempts to reproduce blow-out coils and operating coils compatible with Hubbell's 5210 contactor, EPSU does not use Hubbell design specifications or drawings; Hubbell machining specifications or drawings; or Hubbell engineering specifications, drawings or other documents. EPSU also does not have any instructions as to the process Hubbell follows when it or its authorized supplier manufactures blow-out coils or operating coils for Hubbell's 5210 contactor. 17. EPSU does not use Hubbell welding specifications or certified welders when it attempts to reproduce blow-out coils or operating coils for Hubbell's 5210 contactor.

18. EPSU has not obtained any advice or guidance from Hubbell as to the reproduction of components compatible with the 5210 contactor. Indeed, EPSU did not inform Hubbell that it was attempting to reproduce the components.

19. On information and belief, EPSU does not use the same grade of copper stock for its reproduced blow-out coils or operating coils that Hubbell uses for blow-out coils or operating coils made for Hubbell's 5210 contactor. EPSU does not use the same welding process that Hubbell uses for its blow-out coils, and does not use the same quantity or quality of wire that Hubbell uses for its operating coils.

20. EPSU intends to reproduce blow-out coils and operating coils that resemble as closely as possible blow-out coils and operating coils manufactured by Hubbell. EPSU intends its reproductions to match original Hubbell components in form, fit and function, and in design, appearance, operation, capacity and life span. To that end, EPSU uses Hubbell part numbers on its unlawfully reproduced products and imprints those numbers using the same method, font and type size as Hubbell uses to imprint part numbers on authentic products.

21. EPSU's president Roy Vincent admitted under oath that EPSU lacks specifications, drawings or other instructions as to the process to be followed when manufacturing blow-out coils or operating coils for Hubbell contactors. In another proceeding, Mr. Vincent testified as follows:

> Q. Is it fair to say that when EPSU decided to manufacture the – Hubbell blowout coil, it decided it would be able to accomplish that feat without having any design drawings, any machining drawings, any instructions as to the process that Hubbell followed when it or its supplier made a blowout coil?
>
> A. That's correct.
>
> Q. And was it EPSU's intent to produce a blowout coil that resembled a Hubbell blowout coil as closely as possible, if not identical, to a Hubbell blowout coil?
>
> A. It was our intent to make one that – that fit – in form, fit and function would be the same as a Hubbell, yes.
>
> Q. Okay. And your intention was that it either be identical or closely resemble the Hubbell blowout coil in its design, appearance, operation, capacity and life span; is that fair to say?
>
> A. Yes.

Deposition of Roy Edward Vincent, *Arcelormittal Indiana Harbor, LLC v. Hubbell Industrial Controls, Inc., et al.*, No. 45D10-0802-PL-0025 (Lake County, IN Circuit Court) (hereinafter "Vincent Dep.") at 304:14-25 & 305:1-14.

22. When EPSU supplies Hubbell contactors to customers, EPSU does not identify whether the contactor contains parts made by Hubbell or parts reproduced by EPSU. Mr. Vincent testified under oath that "if [customers] buy a Hubbell contactor from me, I don't really distinguish that it is a Hubbell Hubbell contactor as compared to an EPSU Hubbell contactor." Vincent Dep. at 172:11-14.

23. EPSU also does not put a label identifying EPSU on the part reproduced by EPSU, or on the contactor that contains a component reproduced by EPSU. Mr. Vincent admitted under oath that EPSU continues to use Hubbell's nameplate on contactors containing components reproduced by EPSU. Vincent Dep. at 330:1-5. And EPSU does not put its name on the product label:

> Q. And does EPSU's name appear on the – on the label anywhere?
>
> A. No, it doesn't.
>
> Q. Why not?
>
> A. No – no reason.
>
> Q. And the – on the label EPSU made, EPSU was using the type 5210 Hubbell nomenclature, correct?
>
> A. That's correct.
>
> Q. And it's also using the Hubbell part number 59800-990 nomenclature.
>
> A. That's correct.

Vincent Dep. at 332:1-11. 24. EPSU also does not identify reproduced parts as such on customer invoices, packing slips and quotes. Instead, as Mr. Vincent admitted under oath, EPSU uses the same nomenclature whether it ships to customers an original Hubbell contactor or a Hubbell contactor that contains components reproduced by EPSU:

> Q. EPSU uses the same nomenclature whether EPSU is shipping an EPSU version of a Hubbell contactor or an original Hubbell contactor, correct?
>
> A. That's correct.

Vincent Dep. at 355:23-25 & 356:1.

25. Mr. Vincent knows that Hubbell is a registered trademark and trade name and has known that since the early 1990s. Vincent Dep. at 362:19-23.

7

26. Mr. Vincent admits that customers may not know that they are purchasing a Hubbell contactor that contains parts made by EPSU: "I make the assumption that anybody buying from us thinks that they're getting something made from us, but in reality, I don't know that." Vincent Dep. at 174:14-17.

## COUNT I
### Trade Dress Infringement
### 15 U.S.C. § 1125(a)

27. Hubbell incorporates into this Count I by reference paragraphs 1 through 26 of this Complaint as though fully set forth herein.

28. Section 1125(a)(1)(A) of the Lanham Act provides, in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any work, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of facts, which --
>
> (A) is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

29. For a number of years prior to the acts complained of herein, Hubbell and its predecessors have been continuously engaged in the design, manufacture, distribution and/or sale of various industrial control products and devices including, but not limited to, contactors and their components.

30. Long prior to the acts complained of herein, Hubbell and its predecessors adopted and commenced the use of distinctive trade dress configurations for these contactors sold under the HUBBELL® trademark. Hubbell and its predecessors have continuously used that distinctive trade dress in connection with such goods in the advertising, marketing and sale

thereof in interstate commerce. A photograph illustrating one of the trade dress configurations for HUBBELL® contactors is attached hereto as Exhibit D.

31. Hubbell and its predecessors have spent substantial sums in advertising their contactors.

32. As a result of the advertising and sales of contactors incorporating Hubbell's trade dress configurations, those trade dress configurations have become well and favorably known to the purchasing public as distinctive indications of the origin of Hubbell's contactors.

33. The distinctive features of the trade dress configurations for Hubbell's contactors are not functional.

34. Hubbell is the owner of the trade dress configurations for the aforementioned products and have established valuable, exclusive trade dress rights that are protectable under section 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a), and at common law.

35. Notwithstanding Hubbell's well-known and prior established rights in the trade dress for the aforementioned products, EPSU has been and is engaged in the reproduction of blow-out coils and operating coils for Hubbell contactors that incorporate trade dress configurations that are confusingly similar to the trade dress configurations for Hubbell's products.

36. EPSU's use of the trade dress and other trade dress configurations that simulate Hubbell's contactors is likely to cause confusion, mistake or deception as to the source, origin, sponsorship and/or affiliation of the contactors, and specifically their component blow-out coils and/or operating coils reproduced by EPSU, and therefore constitutes trade dress infringement under section 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a), and at common law.

9

37. EPSU's use of trade dress configurations that simulate Hubbell's contactors, for contactors that do not contain components manufactured by or emanating from Hubbell, has exploited and traded upon the substantial goodwill and reputation of Hubbell and is enabling EPSU to misrepresent contactors as originating from or otherwise being sponsored or approved by Hubbell. Furthermore, on information and belief, Hubbell is further damaged by EPSU's use of trade dress that simulates Hubbell's trade dress because the performance of the blow-out coils and/or operating coils in contactors incorporating that trade dress is inferior to the performance of Hubbell's blow-out coils and/or operating coils in contactors. Hubbell has suffered injury in the form of lost sales in an amount yet to be determined.

38. Hubbell at no time consented to EPSU's use of the HUBBELL® trademark or trade dress for the purpose of selling contactors that contain blow-out coils and/or operating coils reproduced by EPSU.

39. Unless EPSU is restrained, EPSU will continue to infringe the trade dress for Hubbell's products, thereby deceiving the public and causing Hubbell immediate and irreparable harm to its reputation and goodwill as well as the continued loss of sales.

## COUNT II
**Trademark Infringement**
**15 U.S.C. § 1114(1)**

40. Hubbell incorporates into this Count II by reference paragraphs 1 through 26 of this Complaint as though fully set forth herein.

41. For many years prior to the acts complained of herein, Hubbell and its predecessors have been continuously engaged in the design, manufacture, distribution and/or sale of various industrial control products and devices including, but not limited to, contactors.

10

42. Long prior to the acts complained of herein, Hubbell and its predecessors adopted and commenced the use of the HUBBELL® trademarks on or in connection with such goods and in the advertising, marketing and sale thereof in interstate commerce since that time.

43. Hubbell and its predecessors have continuously used these marks on their contactors and in the advertising, marketing and sale thereof in interstate commerce.

44. As a result of such extensive and substantial advertising and sales of contactors bearing the trademarks and the maintenance of premium quality standards relating to them, these marks have become well and favorably known to the public as a distinctive indication of the origin of Hubbell's products.

45. The aforementioned Registration is prima facie evidence of the validity and Hubbell's ownership and is constructive notice of Hubbell's ownership of the aforementioned trademark, as provided by § 7(b) and § 22 of the Federal Trademark Act, 15 U.S.C. § 1057(b) and § 1072. The Registration has incontestable status and is conclusive evidence of the validity of the trademark and Hubbell's exclusive right to use the mark for contactors in commerce, as provided by § 15 and § 33(a) of the Federal Trademark Act, 15 U.S.C. § 1065 & § 1115(a).

46. Notwithstanding Hubbell's well-known and prior established rights in its trademark, EPSU continues to market, offer for sale and sell contactors in interstate commerce bearing the HUBBELL® trademark but containing component parts reproduced by EPSU without Hubbell's knowledge or consent.

47. EPSU has used and continues to use the trademark to exploit and trade upon the substantial goodwill and reputation of Hubbell symbolized by its trademark and to enable EPSU to misrepresent the contactors containing EPSU-reproduced components as emanating from or otherwise sponsored or approved by Hubbell.

48. EPSU's use of reproductions of the HUBBELL® trademark in the marketing, offering for sale, and sale of contactors is likely to cause the public to believe, contrary to fact, that the contactors and their components are manufactured by or emanate from, or are otherwise sponsored or approved by, Hubbell. EPSU's use of the trademark infringes Hubbell's exclusive rights in the trademark under § 32(1) of the Federal Trademark Act, 15 U.S.C. § 1114(1), and at common law.

49. Hubbell is further damaged by EPSU's use of the trademark because, on information and belief, the performance of contactors containing components reproduced by EPSU is inferior to the performance of contactors containing components manufactured by or emanating from, or otherwise sponsored or approved by, Hubbell. Hubbell has suffered injury in the form of lost sales in an amount yet to be determined.

50. EPSU had actual knowledge of Hubbell's prior use of and exclusive rights in its trademark when EPSU began marketing, offering for sale and selling contactors bearing the HUBBELL® trademark but containing components reproduced by EPSU. EPSU has therefore willfully and deliberately infringed Hubbell's exclusive rights in the trademark.

51. Hubbell at no time consented to EPSU's use of the HUBBELL® trademark or trade dress for the purpose of selling contactors that contain blow-out coils and/or operating coils reproduced by EPSU.

52. Unless EPSU is restrained, EPSU will continue to infringe Hubbell's trademark, thereby deceiving the public and causing Hubbell immediate and irreparable injury for which Hubbell has no adequate remedy at law.

## COUNT III
## Unfair Competition

53. Hubbell incorporates into this Count III by reference paragraphs 1 through 26 of this Complaint as though fully set forth herein.

54. EPSU's use of trade dress that simulates the trade dress of Hubbell's contactors and reproductions of the HUBBELL® trademark constitutes a false designation of origin within the meaning of § 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a), which is likely to confuse, mislead or deceive the public as to the source, sponsorship and/or approval of the contactors, thereby causing Hubbell irreparable injury for which it has no adequate remedy at law.

55. The nature and effect of EPSU's use of trade dress simulating Hubbell's contactors and reproductions of the trademark is to enable EPSU to confuse or deceive the public and others by passing off contactors incorporating that trade dress and bearing those reproductions as manufactured by or emanating from, or otherwise sponsored or approved by, Hubbell when in fact certain components were reproduced by EPSU. Such conduct constitutes unfair competition with Hubbell at common law and, if not restrained, will continue to cause Hubbell immediate and irreparable injury for which Hubbell has no adequate remedy at law.

## EXCEPTIONAL CASE

56. EPSU's sale of reproduced goods presents an exceptional case. EPSU knew that the blow-out coils and/or operating coils it sold for or with Hubbell's 5210 contactor were not authentic Hubbell products. EPSU also knew that Hubbell is a registered trademark and trade name. EPSU's sale of contactors containing component parts reproduced by EPSU was purposeful and knowing and merits a finding that exceptional circumstances exist sufficient to support an award of attorneys' fees and treble damages.

57. In the alternative, EPSU's sale of goods entitles Hubbell to statutory damages pursuant to 15 U.S.C. § 1117(c).

## PRAYER FOR RELIEF

WHEREFORE, Hubbell prays that this Court enter judgment in its favor and against EPSU in an amount to be proved at trial and/or statutory damages; to find that this matter presents an exceptional case meriting an award of costs, including attorneys' fees, and enhanced damages; to enter an order (a) enjoining and restraining EPSU, and its respective agents, representatives, officers, and employees, from selling counterfeit products and (b) requiring EPSU to account to Hubbell for each and every purchase and sale of such counterfeit products; enter an order requiring EPSU to deliver up for destruction or alteration any contactors, component parts, advertisements, price lists, product brochures, labels, signs, prints, decals, packages, boxes, cartons, wrappers, receptacles, and all other materials in EPSU's possession, custody or control that embody any infringing reproduction of the trade dress of or any trademarks belonging to Hubbell; and for such other and additional relief as the Court deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Hubbell demands trial by jury of all issues triable of right by jury.

Dated: October 26, 2012

Respectfully submitted,

/s/ Mark P. Miller
Mark P. Miller (ARDC No. 06191128)
mmiller@btlaw.com
Alison C. Conlon (ARDC No. 6272083)
aconlon@btlaw.com
Barnes & Thornburg LLP
One North Wacker Drive
Chicago, IL 60606

(312) 357-1313 (telephone)
(312) 759-5646 (facsimile)